JOHN BECKER, et al.

*Plaintiffs*,

v.                                                         Civil Action No. ELH-18-00931

PAUL HOWE NOE, II, *et al.*

*Defendants*.

## MEMORANDUM OPINION

In this fraud and breach of contract case, lodged under federal and Maryland law, plaintiffs John Becker; Joan Becker; Stanley J. Sersen; Environmental Design & Resource Center, LLC ("EDRC"); and Architectural Support Group, Inc. ("ASG") filed suit against multiple defendants. They are Eco-Gen Energy, Inc. ("Eco-Gen") and four of its officers and/or advisors: Paul Howe Noe, II, "aka Paul B. Delanoe, aka Paul Boaventura-Delanoe"; Licia B. Noe, "aka Licia Boaventura-Delanoe," in her personal capacity and as trustee of the Bellagio Trust; Julia Otey; and Raoul Hamilton (collectively, the "Eco-Gen Defendants"). *Id.* ¶¶ 6-10. Plaintiffs also sued defendants Operating Expense Consulting, LLC ("OPEX") and Ralph Warren, the managing member of OPEX (collectively, the "OPEX defendants"). *Id.* ¶¶ 11-12.

The Amended Complaint (ECF 35), supported by exhibits, alleges, *inter alia*, that defendants engaged in a fraudulent scheme to induce plaintiffs to purchase a hybrid wind and solar powered electricity generator, called "JouleBox," as well as stock in Eco-Gen.[1] According to the Amended Complaint, defendants marketed JouleBox as a product that "can generate more

---

[1] Plaintiffs filed their initial Complaint on March 30, 2018. ECF 1.

electrical output than is required to power it," without using any external power source. *Id.* ¶ 1. However, plaintiffs maintain that the generator does not work as described. *Id.*

The Amended Complaint contains five claims. Count I asserts a claim of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), under 18 U.S.C. § 1962(c). ECF 35, ¶¶ 49-58. Count II alleges conspiracy to violate RICO, based on 18 U.S.C. § 1962(d). ECF 35, ¶¶ 59-65. In Count III, plaintiffs allege fraud. ECF 35, ¶¶ 66-70. Count IV alleges civil conspiracy. ECF 35, ¶¶ 71-74. And, Count V asserts breach of contract. ECF 35, ¶¶ 76-87. Plaintiffs seek monetary relief, including treble and punitive damages, as well as attorneys' fees and costs. *See* ECF 35.

Jurisdiction is based on 28 U.S.C. § 1331, "because this action arises under the laws of the United States, namely [the RICO statute,] 18 U.S.C. §§ 1961, *et seq.*," as well as 18 U.S.C. § 1341 (mail fraud), § 1343 (fraud by wire, radio, or television), and § 2314 (transportation of stolen goals, securities, or moneys). ECF 35, ¶ 14. In addition, plaintiffs assert jurisdiction based on diversity of citizenship, pursuant to 28 U.S.C. § 1332, as well as supplemental jurisdiction under 28 U.S.C. § 1967. ECF 35, ¶ 14.

OPEX is the sole defendant to have answered the suit. ECF 28. Warren has moved to dismiss the Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(2), for lack of personal jurisdiction (ECF 38), supported by a memorandum. ECF 38-1 (collectively, the "Warren Motion"). Plaintiffs oppose the Warren Motion (ECF 41), and submitted two exhibits. ECF 41-1; ECF 41-2. Warren has not replied, and the time to do so has expired. *See* Local Rule 105.6. The Eco-Gen Defendants also moved to the dismiss, pursuant to Fed. R. Civ. P. 12(b)(2), claiming lack of personal jurisdiction, and under Fed. R. Civ. P. 12(b)(6), for failure to state a claim. ECF 40. The motion is supported by a memorandum of law. ECF 40-1 (collectively, the "Eco-

2

Gen Motion"). Plaintiffs oppose the Eco-Gen Motion (ECF 42), and defendants have replied. ECF 43.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Warren Motion (ECF 38). And, I shall grant the Eco-Gen Motion (ECF 40) in part and deny it in part.

## I.     Factual Background[2]

John Becker and Joan Becker (the "Beckers") are husband and wife. ECF 35, ¶ 2. They are Maryland residents. *Id.* Sersen, a Maryland resident,[3] is a member of EDRC and a shareholder and officer of ASG. *Id.* ¶ 3. EDRC, a Maryland limited liability company, filed articles of cancellation in 2017. *Id.* ¶ 4. However, pursuant to Md. Code (2014 Repl. Vol., 2018 Supp.), § 4A-908 of the Corporations and Associations Article ("C.A."), EDRC "continues to exist for the purpose of pursuing its claims against Defendants." *Id.* ASG, a Maryland corporation, "was voluntarily dissolved in 2017." *Id.* ¶ 5. Thereafter, pursuant to C.A. § 3-410, "Sersen became a trustee of the assets of ASG, including ASG's claims against Defendants." *Id.*

OPEX "is a limited liability company organized under South Dakota law, with its principal office in South Dakota." ECF 35, ¶ 11. OPEX has two members: Warren and Mike Beaulieu. ECF 29 (Local Rule 103.3 Disclosure Statement) at 1. Warren "is a South Dakota resident, the managing member of OPEX, and a certified public accountant licensed in the State of South

---

[2] As discussed, *infra*, given the posture of the case, I must assume the truth of the well pleaded factual allegations.

[3] As noted, the individual plaintiffs are Maryland "residents." ECF 35, ¶¶ 2-3. And, as discussed, *infra*, plaintiffs refer to the places of residency of the individual defendants. Residency is relevant to service of process under 18 U.S.C. § 1965(d), in connection with RICO. For diversity purposes, however, it is the place of *citizenship* that is of relevance, rather than the place of *residence*. *See* 28 U.S.C. § 1332(a)(1).

Dakota." ECF 35, ¶ 12. As the "owner" of OPEX, Warren "identifies OPEX as the U.S. Distributor for the JouleBox and the U.S. marketing company for Eco-Gen." *Id.* ¶ 35.

Eco-Gen "is a Nevada corporation with its principal office in California." *Id.* ¶ 8. Hamilton "is a California resident and an officer of Eco-Gen." *Id.* ¶ 9. Otey is also "a California resident and an officer of Eco-Gen." *Id.* ¶ 10.

Paul Howe Noe, II, also known as Paul B. Delanoe and Paul Boaventura Delanoe, is a California resident and an officer, owner, and board member of Eco-Gen. *Id.* ¶ 6. According to the Amended Complaint, "Mr. Noe legally changed his surname to Boaventura-Delanoe in 2013, but his name at birth was Paul Howe Noe, II, and he has continued to use that name even after he legally changed it." *Id.* However, Noe asserts that his name is Paul B. Delanoe, and that he was "incorrectly sued herein as Paul Howe Noe, II." ECF 15.

Mr. Noe is married to Licia Boaventura Noe, a California resident. ECF 35, ¶ 7. In 2013, she "changed her name from Licia Boaventura Noe to Licia Boaventura-Delanoe." *Id.* Ms. Noe is a member of Eco Gen's "'board of technology advisors'" and a trustee of the Bellagio Trust, "which owns and licenses to Eco-Gen Energy, Inc. the purported intellectual property for the JouleBox." *Id.*

According to plaintiffs, "Mr. Noe changed his name to conceal" his "long history of criminal fraud convictions and questionable financial practices." *Id.* ¶ 24 (citing ECF 35-6, Exhibit E; ECF 35-7, Exhibit F). Specifically, in 1989 Mr. Noe "was convicted of wire fraud by the U.S. District Court for the Eastern District of Pennsylvania." ECF 35, ¶ 24 (citing ECF 35-7). *See United States v. Clifford D. Noe and Paul H. Noe, II*, 1989 WL 5567, Crim. Nos. 87-00303-01, 87-00303-02, 1989 WL 5577 (E.D. Pa. Jan 19. 1989); *United States v. Clifford D. Noe and Paul H. Noe, II*, Crim. Nos. 87-00303-01, 87-00303-02, 1989 WL 5577 (E.D. Pa. Jan. 19 1989); *United*

*States v. Clifford D. Noe*, Crim. No. 87-00303-01, 1990 WL 67117, at *2 (E.D. Pa. May 16, 1990)).

Also, plaintiffs allege that "[o]n August 1, 2003, the California Department of Insurance issued a Cease and Desist Order against Paul Noe for engaging in the unlicensed sale of insurance products" by "induc[ing] elderly clients to purchase living trusts." ECF 35, ¶ 24 (citing ECF 35-8, Exhibit G). And, they claim that in 2010, Mr. Noe was "ordered by the California Real Estate Commissioner to cease and desist from offering loan modification services and foreclosure rescue services in violation of California law." ECF 35, ¶ 24 (citing ECF 35-9, Exhibit H).

In addition, plaintiffs maintain that Mr. Noe continued to use the name "Paul H. Noe, II" to thwart mortgage foreclosure proceedings on his home. ECF 35, ¶ 24 (citing *Paul H. Noe, II v. Morg. Elec. Registration Sys., Inc., et al*, Case No. 16-cv-06316 (C.D. Cal. Aug. 23, 2016)). And, in 2016, he "filed multiple petitions for bankruptcy" under the name of Paul H. Noe, II. ECF 35, ¶ 24 (citing *Paul H. Noe, II*, No. 16-bk-23853 (Bankr. C.D. Cal. Oct. 20, 2016) (dismissed on November 23, 2016, for failure to file schedules); *Paul H. Noe, II*, No. 16-bk-25416 (Bankr. C.D. Cal. Nov. 22, 2016) (dismissed on December 12, 2016, for failure to file schedules)).

Plaintiffs contend that beginning in 2009 and "continuing to the present day" defendants "have constituted an associated-in-fact enterprise" (the "Enterprise") under 18 U.S.C. § 1961(4). ECF 35, ¶ 13. According to plaintiffs, defendants "conspired to perpetrate . . . a scheme to defraud Plaintiffs through a litany of illegal acts, including mail fraud, wire fraud, interstate transportation of fraudulently acquired money and securities, and inducement of interstate travel in furtherance of a scheme to defraud." *Id.*

Plaintiffs characterize the Enterprise as "a classic Ponzi scheme." *Id.* ¶ 20. Specifically, it "used a two-fold strategy comprised of collecting cash deposits on contracts to sell non-existent JouleBoxes, and selling stock in Eco-Gen to unsuspecting investors." *Id.* The Enterprise offered

5

"special terms" to prospective purchasers as "'early adopters,' which would enable them to earn commissions on later sales." *Id.* Further, the Enterprise "cloak[ed] their scheme with indicia of legitimacy," by forming and registering Eco-Gen and OPEX with the Secretaries of State in Nevada, California, and South Dakota, securing trademark registration for the name JouleBox, filing a patent application for the hybrid electric generator, drafting and issuing a private placement memorandum to secure investments in Eco-Gen, and establishing websites for both companies." *Id.* ¶ 21.

On or about March 23, 2009, Hamilton and Otey, "on behalf of the Enterprise, filed articles of incorporation for Eco-Gen with the Nevada Secretary of State." *Id.* ¶ 22. Every year thereafter, "the Enterprise filed with the Nevada Secretary of State an annual list naming Mr. Hamilton and Ms. Otey as Eco-Gen's officers and directors." *Id.* (citing ECF 35-3, Exhibit B). Similarly, in November 2012, Otey, "on behalf of the Enterprise," registered Eco-Gen "to do business in California." *Id.* ¶ 23 (citing ECF 35-4, Exhibit C).

In June 2013, Eco-Gen applied for "a trademark for the term 'JouleBox,' referring to it in the application as a 'hybrid wind-powered and solar-powered electricity generator.'" ECF 35, ¶ 25. On or about August 1, 2013, through counsel, the Enterprise "issued a Private Placement Memorandum ('PPM') for Eco-Gen." *Id.* ¶ 26. Per the PPM, "the Enterprise sought to finance its activities by selling $25 million worth of stock." *Id.* (citing ECF 35-10, Exhibit I). The PPM "identifies" the Noes, Hamilton, and Otey as "officers of Eco-Gen"; Mr. Noe and Ms. Noe as members of "Eco-Gen's Board of Technology Advisors"; and Ms. Noe as "'Trustee [who] oversees all [Intellectual Property] with the Bellagio Trust that owns most of the IP for the Hybrid Solar Generator.'" ECF 35, ¶ 26 (citing ECF 35-10). Upon "information and belief," plaintiffs

6

further allege that defendants "have used the PPM to solicit investments from numerous other victims." ECF 35, ¶ 27.

Plaintiffs allege that on November 4, 2013, Mr. Noe, "acting on behalf of the Enterprise," prepared "'Bank Wire Instructions' . . . to make wire transfers of money in interstate commerce, to Eco-Gen's bank account at Bank of America, N.A., Van Nuys, California 91405 . . . ('Account No. 9291')." *Id.* ¶ 28. Then, on March 21, 2014, Mr. Noe, "using the name Delanoe and acting on behalf of the Enterprise, applied to the U.S. Patent and Trademark Office ('USPTO') for a patent for the JouleBox." *Id.* As the "purported inventor," he "assigned the purported intellectual property for the JouleBox to Licia Noe, as trustee for the Bellagio Trust." *Id.*

According to plaintiffs, their first contact with defendants occurred "in or about the period from December 2014 to January 2015, when John Becker had several telephone calls with Ralph Warren . . . ." *Id.* ¶ 29. During the calls, "Warren made claims about the JouleBox, and the profits to be made investing in Eco-Gen and selling the JouleBox." *Id.*

In February and March of 2015, Warren allegedly told Becker that Warren, his partner in OPEX, Mike Beaulieu, and others had invested in Eco-Gen stock. *Id.* ¶ 30. In addition, "Warren described the JouleBox as a solar hybrid generator" and represented that, because of the generator's "unique motor and generator technology," it "could produce more power than solar panels of the same size." *Id.* Also, "Warren represented to Mr. Becker that the JouleBox could run on its own continuously and perpetually, with only brief periods of downtime for annual maintenance." *Id.* Warren, identifying himself as a licensed certified public accountant, "represented that solar panels were not a necessary part of a JouleBox, but including them made it eligible for renewable solar energy tax credits." *Id.* And, he claimed that "the wind turbine component of the JouleBox made it eligible for renewable wind energy tax credits." *Id.* Acting

7

on Warren's advice, Mr. Becker "engaged a tax accountant recommended by Mr. Warren who opined that the JouleBox was eligible for renewable energy tax credits." *Id.*

In mid March 2015, Warren arranged for Mr. Becker to travel to Van Nuys, California, "to visit the Eco-Gen facility." *Id.* ¶ 31. There, "Mr. Becker met with Mr. Noe and Ms. Otey, and also met another prospective salesman and investor, Mike Burkey." *Id.* During the visit, Mr. Becker observed a demonstration of the JouleBox. *Id.* Specifically, "Mr. Noe started the JouleBox, used a voltage meter to demonstrate that it was producing electricity, and connected several appliances to it to demonstrate its ability to power them." *Id.* Notably, this particular Joulebox "was installed indoors and did not have any solar panels." *Id.* However, according to the Amended Complaint, "Mr. Noe insisted that [the JouleBox] was not connected to any source of external power, and represented to Mr. Becker that the JouleBox could run on its own continuously and perpetually, with only brief periods of downtime for annual maintenance." *Id.* If true, JouleBox would have been "a valuable and revolutionary product[.]" *Id.* But, plaintiffs maintain that such representations were "false." *Id.*

Mr. Becker's visit purportedly "lasted less than two hours, during which he was not allowed to take photographs and was unable to see the bottom and one side of the JouleBox." *Id.* At the conclusion of the visit, Otey told Mr. Becker "that she would send him documents that would enable him to invest in Eco-Gen[.]" *Id.*

On or about March 30, 2015, via interstate commerce, Otey delivered to the Beckers the Subscription Agreement and the PPM dated August 1, 2013 (ECF 35-10), offering "to sell the Beckers 25,000 shares of Eco-Gen stock for a purchase price of $25,000." ECF 35, ¶ 32 (citing ECF 35-10). In addition, the document "included a financial *pro forma* which projected revenue of $8.7 million in 2015, growing to $29 million in 2017, and profits of $3.6 million in 2015,

growing to $11.9 million in 2017." ECF 35, ¶ 32 (citing ECF 35-11, Exhibit J). The Amended Complaint alleges that such "claims about Eco-Gen's financial prospects were . . . false." ECF 35, ¶ 32.

Using "the wire transfer instructions prepared and provided by the Enterprise," the Beckers purchased 25,000 shares of stock in Eco-Gen on March 31, 2015, and "transferred $25,000 to Eco-Gen's Account No. 9291". *Id.* ¶ 33. On April 9, 2015, Otey informed Mr. Becker by email, *i.e.*, wire communication in interstate commerce, "that 'the stock certificate and the signed paperwork should go out today.'" *Id.* ¶ 34. The Enterprise delivered the certificate to the Beckers in Maryland on or about April 16, 2015, via "mail, [or] private or commercial interstate carrier . . . ." *Id.* The certificate was "signed by Ms. Otey as Secretary and Mr. Hamilton as President of Eco-Gen." *Id.*

As a part of the Enterprise, "OPEX and Warren recruited other persons to serve as sales representatives to sell the JouleBox to business and consumers." *Id.* ¶ 35. Warren allegedly "told Mr. Becker that OPEX was selling JouleBoxes in other states, including California, Michigan, and Florida, among others, and also countries outside the U.S., including Saudi Arabia, the Philippines, and others." *Id.* In reliance on such representations, "John Becker agreed to serve as a sales representative for OPEX and the JouleBox for the Washington, D.C. / Baltimore area." *Id.* ¶ 36. And, Becker "made Sersen aware of the Enterprise's claims about the JouleBox." *Id.* In addition, "[t]he Enterprise published its false claims about the JouleBox on the Eco-Gen and OPEX websites[.]" *Id.* In April and May 2015, Sersen reviewed these websites and then spoke with Warren. *Id.*

On May 30, 2015, in reliance on the Enterprise's claims about JouleBox, EDRC "entered into a written Lease-Purchase Agreement with OPEX, to purchase a 60 kilowatt JouleBox for the total price of $329,995.00." *Id.* ¶ 37; *see* ECF 41-1 ("Purchase Agreement"). Under the Purchase

Agreement, EDRC agreed to "pay a deposit of $151,385.00 to OPEX to be made by wire transfer to OPEX's account at Wells Fargo Bank, N.A., San Francisco, California ... ('Account No. 5334')." *Id.* ¶ 37; *see also* ECF 41-1 at 10. The Purchase Agreement required that, within 120 days of receipt of the deposit, *i.e.*, by September 30, 2015, "OPEX would deliver and place into operation a working JouleBox at EDRC's location in Jessup, Maryland." ECF 35, ¶ 38.

The Purchase Agreement, signed by Warren for OPEX, and by Sersen for EDRC, includes a forum selection clause. Paragraph 22 states, ECF 41-1 at 5:

This Purchase Agreement will be governed by and construed in accordance with the laws of the State of Maryland, including the Maryland Uniform Commercial Code and the Seller and Purchaser hereby attorn to the jurisdiction of the Courts in the State of Maryland.

The Purchase Agreement was amended on May 30, 2015, and again on September 12, 2015. ECF 41-1 at 10-12. Each amendment states, in capital letters: "THIS AMENDMENT SHALL BE CONSTRUED AND GOVERNED BY THE LAWS OF THE STATE OF MARYLAND." *Id.* Sersen and Warren, as OPEX's managing member, signed both amendments. *Id.*

Pursuant to a "side agreement with EDRC," the Beckers "agreed to contribute one-third of the deposit ($50,461)" for the purchase of the JouleBox. ECF 35, ¶ 37. Mr. Becker also "agreed to forego a commission from OPEX," so as to reduce the purchase price to $302,770.00, "and, with ASG, pay the balance of the purchase price." *Id.* On June 1, 2015, following "wire transfer instructions prepared by OPEX and Warren, EDRC transferred $151,385.00 to OEPX's Account No. 5334[.]" *Id.* The payment was received by mail, or interstate carrier, or wire communication in interstate commerce. *Id.*

On July 28, 2015, Mr. Noe, who was in California, "communicated with Sersen and Becker in Maryland," via "video conference call," using wire, radio, or television communication in

interstate commerce. *Id.* ¶ 39. During the call, Mr. Noe "induced Sersen to travel from Maryland to Eco-Gen's office in Van Nuys, California, where Paul Noe claimed Sersen would be able to observe the purported JouleBox prototype and Eco-Gen's manufacturing facility." *Id.* Sersen traveled to California in August 2015. *Id.* During his visit, Sersen was shown a purported "prototype," but he "was told that it was not possible to visit the manufacturing facility." *Id.* Such conduct, according to plaintiffs, "lull[ed]" Sersen "into believing that a working JouleBox would be manufactured and delivered soon." *Id.*

As mentioned, on September 12, 2015, the Purchase Agreement was amended. *Id.* ¶ 40. In particular, ASG was substituted for EDRC as the contract purchaser. *Id.* A week later, on September 19, 2015, via interstate commerce, "the Enterprise delivered to Sersen stock certificate 1231, representing 25,000 shares of stock in Eco-Gen, provided by Eco-Gen as an incentive to ASG as an early adopter of the JouleBox." *Id.* ¶ 41.

The Purchase Agreement required OPEX "to pay all costs and perform all design, permitting, and construction work required to render the JouleBox operational at ASG's facility in Jessup, Maryland." *Id.* ¶ 42. Plaintiffs assert that "ASG performed design and permitting work on behalf of OPEX," valued at $6,357.50, "for which ASG was entitled to be paid" under the Purchase Agreement. *Id.* However, plaintiffs allege that the "amount remains unpaid." *Id.*

Warren allegedly sent Sersen an email on December 4, 2015, "claiming that a test had been run on a prototype JouleBox[.]" *Id.* ¶ 43. Further, Warren "claim[ed] that the 'test was run for 4 or 5 days and confirm[ed] . . . that the generator produced a steady 20 kW and the battery stayed at full power throughout the test period.'" *Id.* (ellipsis in original). According to plaintiffs, Warren sought "to lull Sersen into believing that Defendants could deliver a JouleBox that actually performed as promised and persuade Sersen to not cancel the Lease-Purchase Agreement." *Id.*

11

By early March 2016, "the Enterprise had missed its deadline for delivering a JouleBox by six months, and Plaintiffs received reports that a potential financial backer of Eco-Gen had withdrawn[.]" *Id.* ¶ 44. As a result, "Plaintiffs lost confidence in the Enterprise's ability to deliver a JouleBox." *Id.*

Sersen sent a letter to Warren and OPEX on March 2, 2016, with copies to Eco-Gen, Mr. Noe, Otey, and Hamilton, "demanding that OPEX refund the $151,385.00 deposit and reimburse the $6,3577.50." *Id.* ¶ 45. Then, on March 4, 2016, Sersen sent an email to Warren, with copies to Mr. Noe, Otey, and Hamilton, again "demanding the immediate return of the $151,385.00 deposit and payment of $6,357.50 for services rendered by ASG." *Id.* According to plaintiffs, under the terms of the Purchase Agreement, ASG "had an absolute right to an immediate refund directly from OPEX." *Id.* ¶ 46.

Warren responded by email on March 7, 2016, stating, *id.*:

I met with the management of ECO-GEN Energy, Inc. today to discuss your request for a refund. They have agreed to handle your request and global release of all parties including Operating Expense Consulting, LLC. Their attorneys will contact you with the necessary paperwork and timelines.

Despite Warren's email, the deposit was not refunded. *Id.* ¶ 48. Moreover, plaintiffs assert: "The Enterprise has continued to engage in its fraudulent scheme to the present day." *Id.* ¶ 47.

It appears that the parties contemplated a "Global Settlement Agreement And Mutual Release," dated March 28, 2016. ECF 41-2. However, according to the exhibits provided to the court, OPEX and Warren were the only defendants to sign it. *Id.* at 8.

Plaintiffs filed their initial Complaint on March 30, 2018, and they claim that soon after, on April 3, 2018, "Defendants sent Mr. Sersen a stock purchase solicitation by email, attempting to induce him to pay additional money" for stock in Eco-Gen. ECF 35, ¶ 47. The solicitation included a PPM, identifying the Noes, Hamilton, and Otey "as officers of Eco-Gen"; the Noes "as

members of Eco-Gen's Board of Technology Advisors"; and Ms. Noe as "'Trustee [who] oversees all IP with the Bellagio Trust that owns most of the IP for the Hybrid Solar Generator.'" *Id.* (citing ECF 35-2, Exhibit A, at 24-25).[4]

Additional facts are included in the Discussion.

## II. Legal Standards

As noted, the Eco-Gen Defendants and Warren have moved to dismiss the Amended Complaint for lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2). ECF 38; ECF 40. The Eco-Gen Defendants also seek dismissal of the suit for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). *See* ECF 40.

### A. Rule 12(b)(2)

Defendants' motions to dismiss for lack of personal jurisdiction are predicated on Fed. R. Civ. P. 12(b)(2). "[A] Rule 12(b)(2) challenge raises an issue for the court to resolve, generally as a preliminary matter." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016).

When a nonresident defendant challenges personal jurisdiction, "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citation omitted). The burden "varies according to the posture of a case and the evidence that has been presented to the court." *Grayson*, 816 F.3d at 268.

When the existence of jurisdiction "turns on disputed factual questions the court may resolve the [jurisdictional] challenge on the basis of a separate evidentiary hearing, or may defer

---

[4] Defendants assert that the email of April 3, 2018, was "obviously a mistake given this lawsuit." ECF 40-1 at 7; ECF 43 at 2-3.

ruling pending receipt at trial of evidence relevant to the jurisdictional question." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). In its discretion, a court may permit discovery as to the jurisdictional issue. *See Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993). Or, the court may rule solely on the basis of motion papers, supporting legal memoranda, affidavits, and the allegations in the complaint. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009). In that circumstance, the "plaintiff need only make 'a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge.'" *Grayson*, 816 F.3d at 268 (quoting *Combs*, 886 F.2d at 676); *see also Universal Leather, LLC v. Koso AR, S.A.*, 773 F.3d 553, 558, 560-61 (4th Cir. 2014). However, "'[a] threshold *prima facie* finding that personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing.'" *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 n.5 (4th Cir. 2005) (emphasis in original) (citation omitted); *see Universal Leather*, 773 F.3d at 558; *Combs*, 886 F.2d at 676.

Plaintiffs have not asked for an opportunity to conduct discovery. In any event, neither discovery nor an evidentiary hearing is required here to resolve the motions. *See generally* 5B C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 1351 at 274–313 (3d ed. 2004, 2011 Supp.).

## B. Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of*

14

*Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Paradise Wire & Cable Defined Benefit Pension Fund Plan v. Weil*, ___ F.3d ___, 2019 WL 1105179, at *3 (4th Cir. Mar. 11, 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted). The rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of

action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 423 (2018); *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Comm'w of Va.*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quotation marks and citation omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached

16

by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 533 F.3d 334, 336 (4th Cir. 2009); *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 745 F.3d 131, 148 (4th Cir. 2014). However, because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*).

"[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Pursuant to Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." And, courts may take judicial notice of publicly available records, without converting a motion to dismiss to a motion for summary judgment. *See, e.g., Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) ("Courts are permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment."). A court may also take judicial notice of its own records. *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990).

## C.    Rule 9(b)

To the extent that the Amended Complaint lodges claims of fraud, Fed. R. Civ. P. 9(b) is

pertinent. Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of

a person's mind may be alleged generally."

As a preliminary matter, claims that sound in fraud, whether rooted in common law or

arising under a statute, implicate the heightened pleading standard of Fed. R. Civ. P. 9(b). *See,*

*e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened

pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo*

*Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that an MCPA claim that "sounds in fraud[]

is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").

Under the rule, a plaintiff alleging a claim that sounds in fraud "'must, at a minimum,

describe the time, place, and contents of the false representations, as well as the identity of the

person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens*

*v. First Kuwaiti Gen'l Trading & Contracting Co.,* 612 F.3d 724, 731 (4th Cir. 2010) (citation

omitted). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and

how: the first paragraph of any newspaper story.'" *Crest Construction II, Inc. v. Doe,* 660 F.3d

346, 353 (8th Cir. 2011) (citation omitted).

Rule 9(b) serves several salutary purposes:

First, the rule ensures that the defendant has sufficient information to formulate a
defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b)
exists to protect defendants from frivolous suits. A third reason for the rule is to
eliminate fraud actions in which all the facts are learned after discovery. Finally,
Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

However, by its plain text, Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)).

## D. Exhibits

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007). "Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Under limited circumstances, however, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint

without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

In particular, a court may consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166; *see also* Fed. R. Civ. P. 10(c); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Paradise Wire & Cable, supra*, 2019 WL 1105179, at *4. However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)).

Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (citation omitted); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012); *Am.*

*Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Plaintiffs appended Exhibits A through J to their Amended Complaint, docketed at ECF 35-2 through ECF 35-11. Exhibit A is an email solicitation sent to Sersen on April 3, 2018. *See* ECF 35-2. The solicitation included a PPM, identifying the Noes, Hamilton, and Otey "as officers of Eco-Gen"; the Noes "as members of Eco-Gen's Board of Technology Advisors"; and Ms. Noe as "'Trustee [who] oversees all IP with the Bellagio Trust that owns most of the IP for the Hybrid Solar Generator.'" *Id.* at 24-25.

Exhibit B is Eco-Gen's annual registration list filed with the Nevada Secretary of State, naming Hamilton as Eco-Gen's president and director and Otey as its secretary, treasurer, and director. ECF 35-3 at 2. Exhibit C is Eco-Gen's registration to conduct business in California, filed by Otey on November 9, 2012, with the Office of the Secretary of the State of California. *See* ECF 35-4 at 2-4.

Exhibit D is the Petition for Change of Name, filed by the Noes on January 4, 2013. ECF 35-5 at 2-11. As mentioned, Mr. Noe petitioned to change his name from Paul Howe Boaventura-Noe to Paul Boaventura-Delanoe, and Ms. Noe petitioned to change her name from Licia Boaventura-Noe to Licia Boaventura-Delanoe. *Id.* at 2.

Exhibit E is a San Francisco Weekly article titled "Veteran Con Man Back to Swindling Elderly Veterans," authored by Matt Smith on June 29, 2011. ECF 35-6 at 2-4. In the article, Smith describes Mr. Noe as "a convicted con man who has been investigated and sanctioned by the California Department of Insurance and sued by the California Attorney General." *Id.* at 2. Smith summarizes Mr. Noe's extensive criminal history, including his 1989 conviction "in connection with an insurance scam involving his uncle Clifford." *Id.*

Exhibit F includes two Westlaw printouts of opinions issued in Mr. Noe's 1989 case. ECF 35-7 at 2-3; *see United States v. Clifford D. Noe and Paul H. Noe, II*, 1989 WL 5567, Crim. Nos. 87-00303-01, 87-00303-02, 1989 WL 5577 (E.D. Pa. Jan 19. 1989); *United States v. Clifford D. Noe and Paul H. Noe, II*, Crim. Nos. 87-00303-01, 87-00303-02, 1989 WL 5577 (E.D. Pa. Jan. 19 1989). Exhibit F also includes a third printout of a memorandum and order issued in the case of the codefendant, Clifford Noe. ECF 35-7 at 4-5; *see United States v. Clifford D. Noe*, Crim. No. 87-00303-01, 1990 WL 67117, at *2 (E.D. Pa. May 16, 1990).

Exhibit G is an excerpt of the "2005 Annual Report of the Insurance Commissioner," issued by the California Department of Insurance. ECF 35-8 at 3. The report states, in relevant part, *id.* at 4: "In August 2003, the Department [of Insurance] issued a Cease and Desist order against Paul Noe and his corporation EPI Estate Planning Incorporated." Mr. Noe contested the order, denying "he engaged in the unlicensed sale of insurance products." *Id.* However, an administrative law judge "ruled that good cause existed for the issuance of the Cease and Desist order in that Paul Noe was acting as an Insurance agent, but was not licensed to sell insurance." *Id.*

Exhibit H is a 2010 Order to Desist and Refrain, issued by the California Real Estate Commissioner to Mr. Noe and associates. ECF 35-9. Mr. Noe was ordered to cease and desist

"from performing any acts within the State of California for which a real estate broker license is required," such as loan modification and foreclosure rescue services. *Id.* at 8.

Exhibit I is Eco-Gen's PPM, issued on August 1, 2013. ECF 35-10. And, Exhibit J contains a chart mapping the projected revenue of Eco-Gen between 2015 and 2017. ECF 35-11. As mentioned, *supra*, Exhibits I and J were delivered to the Beckers on March 30, 2015, in an effort to solicit their investment in Eco-Gen.

Plaintiffs appended these exhibits to the suit, and clearly reply upon them to assert their claim. Although defendants may dispute the content or relevance of the exhibits, that would be an issue for a later time. And, as to ECF 35-7, the Court may take judicial notice of other court opinions as relevant public records. *See, e.g.*, *Zak*, 780 F.3d at 607 ("[C]ourts are permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment.").

In addition, plaintiffs appended two exhibits to their opposition to the Warren Motion: the "Lease-Purchase Agreement" (ECF 41-1) and the "Global Settlement Agreement And Mutual Release" ("Release," ECF 41-2). As noted, *supra*, the Purchase Agreement contains a forum-selection clause. ECF 41-1 at 5, 10-12. The agreement is integral to the Amended Complaint: it serves as the basis for plaintiffs' breach of contract claim, and it is relevant to the RICO and fraud claims. Therefore, I shall consider the Purchase Agreement.

The Release, dated March 28, 2016, is also referenced in the Amended Complaint. The Release appears to be signed by Warren, personally and on behalf of OPEX. See ECF 41-2 at 8. Plaintiffs allege that through the execution of the Release, "Warren attempted to lull Sersen into not pursuing legal action against OPEX and Eco-Gen and the other defendants." ECF 35, ¶ 46.

Plaintiffs also rely on the Release for purposes of personal jurisdiction. Of relevance here,

the Release contains a forum-selection clause. Paragraph 11 states, in pertinent part, *id.* at 4:

> **Governing Law and Jurisdiction.** The laws of the State of Maryland shall apply
> to and control any interpretation, construction, performance or enforcement of this
> Agreement. The parties agree that the exclusive jurisdiction for any legal
> proceeding arising out of or relating to this Agreement shall be in the U.S. District
> Court for the District of Maryland, and all Parties hereby waive any challenge to
> personal jurisdiction or venue in that court.

Based on the Release, in which OPEX consented to personal jurisdiction in this District,

plaintiffs contend that this Court also has personal jurisdiction over its member, Warren, as well

as the other defendants. ECF 41 at 10-11. Accordingly, I may consider the Release.

### III. The RICO Statute

### A. RICO Generally

The RICO claim is at the heart of the suit. Therefore, an overview of the RICO statute is

helpful to analyze the motions.

Congress enacted RICO as Title IX of the Organized Crime Control Act of 1970, Pub. L.

No. 91–452, 84 Stat. 922 (1970). *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th

Cir. 1997). RICO prohibits various activities generally associated with organized crime. *See* 18

U.S.C. §§ 1963, 1964.

Under 18 U.S.C. § 1962, it is unlawful, *inter alia*, for any person employed by or associated

with any enterprise to conduct or participate in the "enterprise's affairs through a pattern of

racketeering activity . . . ." 18 U.S.C. § 1962(c). But, RICO is not limited to criminal cases. In

addition to criminal penalties, Congress "granted a private civil right of action to '[a]ny person

injured in his business or property by reason of a violation of' the RICO provisions." *ESAB Grp.*,

126 F.3d at 626 (citing 18 U.S.C. § 1964(c)).

A civil RICO action "'is a unique cause of action that is concerned with eradicating organized, longterm, habitual criminal activity.'" *U.S. Airline Pilots Ass'n v. Awappa, LLC,* 615 F.3d 312, 317 (4th Cir. 2010) (citation omitted); *see, e.g., Lewis v. Maryland,* PWG-17-1636, 2018 WL 1425977, at *5 (D. Md. Mar. 22, 2018); *Bailey v. Atlantic Auto. Corp.*, 992 F. Supp. 2d 560, 578 (D. Md. 2014). But, the Fourth Circuit "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988).

A plaintiff may establish a civil RICO claim by proof of "'1) conduct [causing injury to business or property] 2) of an enterprise 3) through a pattern 4) of racketeering activity.'" *Morley v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989 (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)); *see Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (citing 18 U.S.C. §§ 1962, 1964); *see also Bhari Info. Tech. Sys. Private Ltd. v. Sriram*, 984 F. Supp. 2d 498, 503 (D. Md. 2013); *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 842 (D. Md. 2013); *Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 472 (D. Md. 2012).

A prevailing plaintiff in a civil RICO action is entitled to treble damages, costs, and attorney's fees. *Friedler v. Cole*, CCB-04-1983, 2005 WL 465089, at *7 (D. Md. Feb. 28, 2005). The Supreme Court has characterized RICO's civil penalties as "'drastic.'" *Awappa*, 615 F.3d at 317 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233 (1989)); *see* 18 U.S.C. § 1964(c)).

Congress has directed that the statute "be liberally construed to effectuate its remedial purposes." Pub. L. 91–452, § 904(a), 84 Stat. 941, 947. But, "Congress contemplated that only a party engaging in widespread fraud would be subject to" the "serious consequences" available under the RICO statute, such as treble damages. *Menasco, Inc.*, 886 F.2d at 683. And, courts have

recognized the "need to limit [RICO's] severe penalties to offenders engaged in ongoing criminal activity, rather than isolated wrongdoers." *Friedler*, 2005 WL 465089, at *7.

The Fourth Circuit has noted the "distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *El-Shamari*, 217 F.3d at 238. It has admonished that courts must

> exercise caution "to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted."

*Awappa*, 615 F.3d at 317 (quoting *Menasco, Inc.*, 886 F.2d at 683) (ellipsis in *Awappa*).

In other words, RICO "is not a cause of action to be pled lightly," and "'RICO treatment is reserved for conduct whose scope and persistence pose a special threat to social well-being.'" *Biggs v. Eaglewood Mortg., LLC*, 582 F. Supp. 2d 707, 714 (D. Md. 2008), *aff'd*, 353 F. App'x 864 (4th Cir. 2009). It applies to "'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'" *Menasco, Inc.*, 886 F.2d at 684 (quoting *Zepkin*, 812 F.2d at 155).

In order to analyze the adequacy of a RICO claim, it is important to understand RICO's terms and concepts.

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). *See, e.g., Boyle v. United States*, 556 U.S. 938, 944 (2009); *Kimberlin v. Nat'l Bloggers Club*, GJH-13-3059, 2015 WL 1242763, at *3 (D. Md. Mar. 17, 2015). In *Mitchell Tracey*, 935 F. Supp. 2d at 842, the court explained:

> An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity

"separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477-78 (D. Md. 2009). "[A]n associated-in-fact enterprise is one type of enterprise defined in § 1961(4)." *United States v. Tillett*, 763 F.2d 628, 631 n.2 (4th Cir. 1985). To satisfy § 1962(c)'s "distinctiveness" requirement, the Plaintiffs must further allege that the RICO "enterprise" is distinct from the defendant "person" alleged to have violated RICO. *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 457 (E.D. Pa. 2010); *Toucheque v. Price Bros. Co.*, 5 F. Supp. 2d 341, 346-47 (D. Md. 1998).

Because "'an enterprise includes any union or group of individuals associated in fact,'" RICO extends to "'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle*, 556 U.S. at 944 (quoting *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)). Moreover, a RICO enterprise "need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods." *Id.* at 948. However, "'[v]ague allegations of a RICO enterprise ... lacking any distinct existence and structure' will not survive dismissal." *Mitchell Tracy*, 935 F. Supp. 2d at 843 (citation omitted; modifications in *Mitchell Tracy*).

"Racketeering activity" is defined in § 1961(1)(B) to include a laundry list of "indictable" acts, such as mail fraud, wire fraud, financial institution fraud, among many other crimes. "To allege a pattern of racketeering activity, a plaintiff must present facts making it plausible, rather than possible, that: (1) at least two predicate acts occurred within ten years of each other; (2) the predicate acts were related; and (3) the acts 'amount to or pose a threat of continued criminal activity.'" *Swarey v. Desert Capital REIT, Inc.*, DKC-11-3615, 2012 WL 4208057, at \*12 (D. Md. Sept. 20, 2012) (quoting *H.J. Inc.*, 482 U.S. at 239).

Notably, "RICO is not 'aimed at the isolated offender.'" *Zepkin*, 812 F.2d at 155 (quoting *Sedima*, 473 U.S. at 496 n.14). Therefore, "[t]he pattern requirement was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant

as a person who regularly commits such crimes." *Lipin Enters. v. Lee*, 803 F.2d 322, 324 (7th Cir. 1986).

A "pattern of racketeering activity" requires "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). To prove a pattern, a plaintiff is required to show that the predicate acts "are [1] related *and* [2] that they amount to or pose a threat of *continued* criminal activity." *H.J. Inc.*, 492 U.S. at 239 (first emphasis in original; second emphasis added).

Acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (citation omitted). And, the enterprise's actions must affect interstate commerce. *Sterling v. Ourisman Chevrolet of Bowie, Inc.* 943 F. Supp. 2d 577, 587-88 (D. Md. 2013).

As indicated, a pattern of racketeering activity involves *continued* criminal activity. *H.J. Inc.*, 492 U.S. at 239. The Fourth Circuit has adopted a "flexible" approach to the "continuity" requirement. *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1989), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996). Courts utilize a "case-by-case analysis, *Capital Lighting and Supply, LLC v. Wirtz*, JKB-17-3765, 2018 WL 3970469, at *6 (D. Md. Aug. 20, 2018), and consider "the 'criminal dimension and degree' of the alleged misconduct." *HMK Corp. v. Walsey*, 828 F.2d 1071, 1073 (4th Cir. 1987) (citation omitted); *see Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987) ("[N]o mechanical test can determine the existence of a RICO pattern."); *Brandenburg*, 859 F.2d at 1185 (noting that continuity depends on "all the facts and circumstances of the particular case—with special attention to the context in which the predicate acts occur").

28

"'Continuity' is both a closed – and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. The Fourth Circuit explained in *Mensaco, Inc. v. Wasserman*, 886 F.2d 681, 683-84 (4th Cir. 1989):

> Continuity . . . refers to a closed period of *repeated* conduct, or to past conduct that by its nature projects into the future with a threat of *repetition*. To satisfy the continuity element, a plaintiff must show that the predicates themselves amount to, or . . . otherwise constitute a threat of, *continuing* racketeering activity. Significantly, [p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Thus, predicate acts must be part of a prolonged criminal endeavor.

(Internal quotation marks, citations, and parentheticals omitted; alteration and emphasis in original).

As to continuity, "[f]acts relevant to this inquiry include the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." *Brandenburg*, 859 F.2d at 1185.

Where a fraud claim is asserted as the predicate act for a civil RICO violation, Rule 9(b)'s particularity requirement applies. *See, e.g.*, *Lewis*, 2018 WL 1425977, at \*5 (applying heightened pleading standard to claims under RICO); *Healy v. BWW Law Grp., LLC*, PWG-15-3688, 2017 WL 281997, at \*6 (D. Md. Jan. 23, 2017) (same); *Kimberlin v. Hunton & Williams LLP*, GJH-15-723, 2016 WL 1270982, at \*7 (D. Md. Mr. 29, 2016) (applying Fed. R. Civ. P. 9(b) to RICO claim based on mail or wire fraud), *aff'd*, 671 F. App'x 127 (4th Cir. 2016); *Bailey*, 992 F. Supp. 2d at 584 ("A plaintiff must plead circumstances of the fraudulent acts that form the alleged pattern of racketeering activity with sufficient specificity pursuant to Fed. R. Civ. P. 9(b).") (citations and quotation marks omitted); *Sriram*, 984 F. Supp. 2d at 505.

## B. Personal Jurisdiction Under RICO

Warren and the Eco-Gen Defendants have moved to dismiss the Amended Complaint for lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2). *See* ECF 38; ECF 40.

The Eco-Gen Defendants acknowledge that "RICO provides for personal jurisdiction over all non-resident defendant-members of a racketeering enterprise as long as the court may exercise personal jurisdiction over one of the defendant-members." ECF 40-1 at 11 (citing 18 U.S.C. §§ 1965(b), (d)). But, they argue, *inter alia*, that RICO does not provide a basis for personal jurisdiction here, because the "RICO claims are not colorable," a suit here would offend Due Process, and there is no other basis for personal jurisdiction. *Id.*[5]

Although the parties first address their challenge to the viability of the RICO and State law claims (*see, e.g.*, ECF 38-1; ECF 40-1 at 4; ECF 42 at 15), the Court must first determine whether it has personal jurisdiction over defendants. *See Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 548 (4th Cir. 2006) ("[T]he dismissal of a case on an issue relating to the dispute, such as failure to state a claim, is improper without resolving threshold issues of jurisdiction, including personal jurisdiction.") (citing *Ruhrgas AG v. Marathon Oil*, 526 U.S. 574, 584 (1999) ("Personal jurisdiction . . . is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." (internal quotation marks omitted)).

Plaintiffs advance several grounds to support their claim that this Court has personal jurisdiction. First, they argue that, under Fed. R. Civ. P. 4(k)(1)(C), the Court may exercise personal jurisdiction over defendants because it is "authorized" by the RICO statute. ECF 42 at

---

[5] Warren does not expressly challenge personal jurisdiction under the RICO statute. *See* ECF 38-1. Instead, he relies on Md. Code, § 6-103 of the Courts and Judicial Proceedings Article. ECF 38-1 at 1, 2. He also cites 18 U.S.C. § 1965(d), *id.* at 2, but alters its meaning by failing to quote the provision in full.

21. Second, they assert personal jurisdiction as to all defendants based on OPEX's consent to personal jurisdiction in Maryland, as set forth in the Purchase Agreement and in the Release. *Id.* at 23. Third, plaintiffs maintain that defendants are subject to specific long-arm jurisdiction under Maryland law, consistent with due process. *Id.* at 27. Fourth, plaintiffs assert personal jurisdiction based on the conspiracy theory. *Id.* at 30. Defendants counter that none of the above grounds gives rise to personal jurisdiction. ECF 43 at 4.

Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure provides that service of a summons "establishes personal jurisdiction" over a defendant "when authorized by a federal statute." Plaintiffs maintain that personal jurisdiction here is authorized by the RICO statute. In particular, 18 U.S.C. § 1965(d) provides: "All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs."[6]

The Fourth Circuit "has construed Section 1965(d) as 'authoriz[ing] nationwide service of process and, thus, the exercise of personal jurisdiction in any district court,'" subject to due process considerations under the Fifth Amendment. *Swarey*, 2012 WL 4208057, at *7 (quoting *D'Addario v. Geller*, 264 F. Supp. 2d 367, 386 (E.D. Va. 2003)). In *ESAB Group*, 126 F.3d at 626, the Fourth Circuit said: "[W]here, as here, Congress has authorized nationwide service of process . . . so long as the assertion of jurisdiction over the defendant is compatible with due process [under the Fifth Amendment,] the service of process is sufficient to establish the jurisdiction of the federal court

---

[6] The Docket reflects that the Eco-Gen Defendants were personally served with process in California. *See* 18 U.S.C. § 1965(d); *see also* ECF 4 (Eco-Gen served in California on April 9, 2018); ECF 5 (Otey served in California on April 10, 2018); ECF 6 (Mr. Noe served in California on April 11, 2018); ECF 7 (Hamilton served in California on April 13, 2018; ECF 8 (Ms. Noe served in California on April 13, 2018). And, Warren was served with process in South Dakota. ECF 10. On plaintiffs' motion, the Court entered an Order on May 2, 2018, allowing alternative service of process on Warren and OPEX, by first class mail and certified mail. *See* ECF 10.

over the person of the defendant." (internal quotation marks omitted). Accordingly, "service of process on a RICO defendant in a judicial district where that defendant resides establishes personal jurisdiction, provided that the assertion of jurisdiction comports with due process." *Swarey*, 2012 WL 4208057, at *6.

A defendant may challenge a plaintiff's reliance on the nationwide service of process provision in a RICO case by demonstrating that the RICO claim is not colorable, because it is "'wholly immaterial or insubstantial.'" *Noble Sec., Inc. v. MIZ Eng'g, Ltd.*, 611 F. Supp. 2d 513, 549 (E.D. Va. 2009) (quoting *ESAB Grp.*, 126 F.3d at 629). Alternatively, a defendant may "defeat personal jurisdiction . . . by showing that due process [under the Fifth Amendment] would be violated . . . ." *Swarey*, 2012 WL 4208057, at *7. The Eco-Gen Defendants lodge jurisdictional challenges on both fronts.

A RICO claim is not colorable if it is "implausible, insubstantial, or frivolous." *D'Addario*, 264 F. Supp. 2d at 388. However, "a claim can be colorable while still failing to satisfy the pleading requirements of [Rule 12(b)(6) of] the Federal Rules of Civil Procedure." *Swarey*, 2012 WL 4208057, at *8.

The Due Process Clause of the Fifth Amendment protects the "liberty interests" of the defendants "against unfair burden and inconvenience." *ESAB Grp.*, 126 F.3d at 626. Thus, "To make out a Fifth Amendment challenge to personal jurisdiction," a defendant must show that the "'assertion of personal jurisdiction . . . would result in such extreme inconvenience or unfairness as would outweigh the congressionally articulated policy evidenced by a nationwide service of process provision.'" *Trs. of the Plumbers and Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015) (quoting *Denny's, Inc. v. Cake*, 364 F.3d 521, 524 n.2 (4th Cir. 2004) (some internal quotation marks omitted); *see ESAB Grp.*, 126 F.3d at 627.

As to due process, the Eco-Gen Defendants argue that they are "California residents" who "do not do business in Maryland or have contacts in Maryland." ECF 40-1 at 12. Further, they contend that "[m]ost if not all of the evidence and witnesses in this case will be located in California" and that they "will incur significant expenses to travel to Maryland to litigate this case, which comprises threadbare RICO claims."

Defendants seem to conflate due process under the Fifth Amendment with the "minimum contacts" analysis that applies when assessing personal jurisdiction under the Due Process Clause of the Fourteenth Amendment. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). "That standard, however, is not relevant when the basis for jurisdiction is found in a federal statute containing a nationwide service of process provision." *Trs. of the Plumbers and Pipefitters Nat'l Pension Fund*, 791 F.3d at 443 (analyzing personal jurisdiction under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*)

As noted, to establish a Fifth Amendment due process violation, a defendant must show that personal jurisdiction would result "'in such extreme inconvenience or unfairness as would outweigh the congressionally articulated policy evidenced by a nationwide service of process provision.'" *Trs. of the Plumbers and Pipefitters Nat'l Pension Fund*, 791 F.3d at 444 (citations omitted). In *ESAB Group*, 126 F.3d at 627, a civil RICO case, the Fourth Circuit said: "'[I]t is only in highly unusual cases that inconvenience will rise to a level of constitutional concern.'" (quoting *Rep. of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 947 (11th Cir. 1997)).

Although defendants "will certainly experience some inconvenience" if required to litigate this case in Maryland, they have failed to demonstrate that a Maryland forum "would be so extremely inconvenient or so unfair as to outweigh the Congressional policy of permitting the

exercise of personal jurisdiction pursuant to RICO's nationwide service of process provisions." *Sadighi*, 36 F. Supp. 2d at 274; *see Swarey*, 2012 WL 4208057, at \*8; *D'Addario*, 264 F. Supp. 2d at 387 ("The burden is on the defendant to demonstrate that the assertion of jurisdiction in this forum will make litigation so gravely difficult and inconvenient that he unfairly is at a severe disadvantage in comparison to his opponent.") (internal quotation marks omitted).

As indicated, the Eco-Gen Defendants also contend that plaintiffs have not asserted a "colorable" RICO claim. Therefore, they argue that plaintiffs may not rely on § 1965(d) to establish *in personam* jurisdiction. *See* ECF 43 at 5. Defendants fail to carry the "high burden" of demonstrating that plaintiffs' RICO claim is not colorable. *D'Addario*, 264 F. Supp. 2d at 388.

In determining whether a claim is "colorable," courts consider whether the plaintiff has made a "threshold showing" of the elements of a RICO claim: "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity,' as well as (5) injury in the plaintiff's business or property (6) by reason of the RICO violation." *Swarey*, 2012 WL 4208057, at \*8 (quoting *D'Addario*, 265 F. Supp. 2d at 288)).

The test for colorability is not governed by the standards of Rule 12(b)(6). As noted, for purposes of determining personal jurisdiction under RICO, "a claim can be colorable while still failing to satisfy the pleading requirements of the Federal Rules of Civil Procedure." *Swarey*, 2012 WL 4208057, at \*8; *see also Noble Sec., Inc.*, 611 F. Supp. 2d at 550 (distinguishing between the "colorable federal claim standard" that applies to the personal jurisdiction analysis under Rule 12(b)(2) and the "federal claim upon which relief can be granted" standard that applies to a Rule 12(b)(6) motion to dismiss); *D'Addario*, 264 F. Supp. 2d at 389 n.26 (explaining that although a RICO claim was colorable for purposes of personal jurisdiction, the operative pleading likely required an amendment to include "greater specificity" in order to survive a dispositive motion).

Here, the Amended Complaint, twenty-nine pages in length, contains allegations that defendants participated in an Enterprise that "perpetrated, and continue[s] to perpetrate, a scheme" to defraud plaintiffs "through a litany of illegal acts, including mail fraud, wire fraud, interstate transportation of fraudulently acquired money and securities, and inducement of interstate travel," with respect to the invention of an allegedly bogus generator. ECF 35, ¶¶ 13, 52. Plaintiffs assert that this pattern of conduct began in December 2014, when the Enterprise first contacted plaintiffs, and continued through April 2018, after the initial filing of this suit. *Id.* ¶¶ 29, 47, 55. Further, plaintiffs allege that the injuries caused by the defendants' "RICO violations include but are not limited to the $151,385.00 purchase deposit paid by ASG, the $6,357.50 value of services that ASG rendered to OPEX for which ASG has not been paid, the $25,000 that the Beckers paid for 25,000 shares of Eco-Gen stock, travel expenses and disruption of Plaintiffs' business, including substantial loss and diversion of time of key personnel." *Id.* ¶ 56.

In my view, the RICO claims are colorable. Plaintiffs' RICO claims "cannot be said to be 'wholly insubstantial and immaterial.'" *D'Addario*, 264 F. Supp. 2d at 389 (quoting *ESAB*, 126 F.3d at 629)); *see also Swarey*, 2012 WL 4208057, at *8. Nor is there merit to defendants' Due Process challenge under the Fifth Amendment. Accordingly, plaintiffs have established personal jurisdiction as to the RICO claim.

## C. Failure to State a RICO Claim (Counts I and II)

In Count I, plaintiffs allege that defendants violated the federal RICO statute, 18 U.S.C. § 1962(c). ECF 35, ¶¶ 49-58. In Count II, plaintiffs assert that defendants conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). ECF 35, ¶¶ 59-65. The Eco-Gen Defendants have moved to dismiss the RICO claims under Rule 12(b)(6), asserting that plaintiffs have not alleged facts sufficient to support their RICO claims. ECF 40-1 at 4.

As indicated, in order to state a civil RICO claim under § 1962(c), a plaintiff must allege "(1) conduct [causing injury to business or property]; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *Sedima, S.P.R.L.*, *supra*, 473 U.S. at 496 (footnote omitted); *see Al-Abood ex. Rel. Al-Abood*, 217 F.3d at 238; *Morley*, 888 F.2d at 1009. The Eco-Gen Defendants do not challenge the sufficiency of plaintiffs' allegations as to the first two elements of a RICO claim, *i.e.*, the "conduct of an enterprise." Rather, they maintain that plaintiffs fail to plead facts sufficient to establish the last two elements, *i.e.*, a "pattern of racketeering activity." *See* ECF 40-1 at 4; ECF 43 at 1.

In support of their RICO claims, plaintiffs rely on the following predicate crimes, listed in 18 U.S.C. § 1961(1): mail fraud (18 U.S.C. § 1341); wire fraud (18 U.S.C. § 1343); receipt of interstate transfers of money taken by fraud (18 U.S.C. § 2314); and inducement of interstate travel by a victim of fraud (18 U.S.C. § 2314). ECF 35, ¶ 52. However, the Fourth Circuit is "cautious about basing a RICO claim on predicate acts of mail and wire fraud because '[i]t will be the unusual fraud that does not enlist the mails and wires in its service . . . .'" *Al-Abood*, 217 F.3d at 238 (quoting *Anderson v. Found. for Advancement, Educ. and Employment of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998)) (internal quotation marks omitted) (alteration in *Anderson*). "This caution is designed to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *Al-Abood*, 217 F.3d at 238.

Plaintiffs focus on a series of acts undertaken by the Enterprise, allegedly directed towards the fraudulent goals of inducing plaintiffs to purchase the JouleBox as well as Eco-Gen stock. ECF 35, ¶ 1. Beginning in 2009, the Enterprise filed articles of incorporation for Eco-Gen in Nevada, and in 2012 the company registered to do business in California. *Id.* ¶ 55(a)-(b).

However, plaintiffs' first contact with defendants did not occur until December 2014, when "John Becker had several telephone calls with Ralph Warren," in which Warren allegedly made several misleading claims about the JouleBox. *Id.* ¶ 29. On March 30, 2015, the Enterprise delivered a PPM to the Beckers, dated August 1, 2013, offering to sell 25,000 shares of Eco-Gen stock for a purchase price of $25,000. *Id.* ¶ 55(g). A day later, the Beckers purchased the stock, transferring $25,000 to Eco-Gen's Account No. 9291. *Id.* ¶ 55(h). EDRC entered into the Purchase Agreement on May 30, 2015, for the purchase of a JouleBox for $329,995.00, initially paying a deposit of $151,385.00 to OPEX by wire transfer to OPEX's bank account. *Id.* ¶ 55(l).

As a part of the defendants' scheme to defraud plaintiffs, defendants also induced John Becker and Sersen, at different times, to travel from Maryland to Eco-Gen's office in California. *Id.* ¶ 55(o)-(p). Following Sersen's visit, the Enterprise delivered a stock certificate to Sersen, representing 25,000 shares of stock in Eco-Gen. *Id.* ¶ 55(q). According to plaintiffs, the Enterprise emailed Sersen on March 7, 2016, "attempting to lull Sersen into not pursuing legal action against" defendants. *Id.* ¶ 55(s). And, as recently as April 3, 2018, soon after suit was filed, the Enterprise "sent Mr. Sersen a stock purchase solicitation by email." *Id.* ¶ 47.

Further, plaintiffs allege monetary loss. This includes their deposit for the purchase of a JouleBox ($151,385); the cost of the purchase of shares of stock in Eco-Gen ($25,000); the "value of services that ASG rendered to OPEX for which ASG has not been paid" ($6,357); as well as "travel expenses" and "disruption of Plaintiffs' business." *Id.* ¶ 56.

To support their contention that they have adequately stated RICO claims, plaintiffs rely, *inter alia*, on *Morley v. Cohen*, *supra*, 888 F.2d 1006. There, the plaintiffs were investors in the defendants' coal mining operations. *Id.* at 1008. As a result of the defendants' misrepresentations, the plaintiffs were induced to make repeated investments in the mining operations and were lulled

into leaving their investments in the defendants' control for five years. *Id.* The Fourth Circuit concluded that the five-year duration of the defendants' fraudulent conduct established the requisite continuity under RICO. *Id.* at 1010; *see also GE Inv. Private Partners II v. Parker*, 247 F.3d 543, 550 (summarizing *Morley*).

Comparing the facts in *Morley* to those in the instant case, plaintiffs contend, ECF 42 at 15-16:

> In both cases, there were a small number of plaintiff investors, whom the Enterprise fraudulently induced to invest in a bogus energy business. . . . In both cases, the Enterprise imitated a legitimate investment opportunity by providing the plaintiffs with a misleading memorandum to induce their investment. In both cases, the defendants induced the plaintiffs to make an additional investment after their initial investment, although in this case the Enterprise went further and tried for a third investment. Finally, in both cases, although the period of time from the defendants' initial contact with the plaintiffs to the plaintiffs' initial investment was comparatively short, the duration of the pattern of racketeering activity was extended by the Enterprise's acts that preceded the plaintiffs' investments, and by the Enterprise's subsequent acts intended to lull the plaintiffs into not taking action to withdraw their investments.

The Eco-Gen Defendants argue that plaintiffs' allegations are not analogous to those in *Morley*. The alleged predicate acts in *Morley* "included 'numerous' letters regarding the plaintiff's investments sent continuously over five (5) years from 1976 to 1981." ECF 43 at 3 (quoting *Morley*, 888 F.2 at 1010). In contrast, the conduct in this case—excluding the email of March 30, 2018—spanned a period of less than 2 years. ECF 43 at 3 (citing *GE Investment*, 247 F.3d at 550 (granting motion to dismiss and distinguishing *Morley*, as the alleged duration was at most two years, which was not "the type of persistent, long-term fraudulent conduct" necessary to avoid dismissal on Rule 12(b)(6))). Further, the Eco-Gen Defendants assert that many of plaintiffs' factual allegations do not constitute predicate acts under RICO, do not satisfy the continuity requirement for racketeering activity, and the alleged scheme only "targeted one small set of

victims, who allege a single discrete injury (monetary loss)" over a relatively brief period of 15 months. *Id.* at 3. ECF 43 at 1.

In particular, defendants note that the incorporation and registration of Eco-Gen and the filing of a trademark application and a patent application with USPTO are not indictable acts under 18 U.S.C. § 1961(a). ECF 43 at 1-2. Moreover, such conduct was not directed at plaintiffs, and so these acts do not qualify as predicate acts. *See Central Distrib. of Beer, Inc. v. Conn*, 5 F.3d 181, 184 (6th Cir. 1993); *Lewis v. Microsoft Corp.*, 410 F. Supp. 2d 432, 439 (E.D.N.C. 2006), *aff'd*, 222 F. App'x 290 (4th Cir. 2007) (per curiam); *Semiconducter Energy Lab. Co. v. Samsung Elec. Co.,* 4 F. Supp. 2d 473, 476 (E.D. Va. 1998), *aff'd*, 204 F.3d 1368 (Fed. Cir. 2000).

Plaintiffs' first contact with defendants occurred in December 2014, when Warren spoke with Mr. Becker about "the profits to be made investing in Eco-Gen and selling the JouleBox." ECF 35, ¶ 29. Subsequent predicate acts include several email exchanges; delivery of the PPM to the Beckers on March 30, 2015; John Becker's trip to California in March 2015; the wire transfer of money from the Beckers on March 31, 2015; delivery of the Eco-Gen stock certificate to the Beckers on April 16, 2015; the Purchase Agreement of May 30, 2015; a video conference call between Paul Noe and Sersen on July 28, 2015; Sersen's trip to California in August 2015; and delivery of the Eco-Gen stock certificate to Sersen on September 19, 2015. These acts spanned a period of approximately 15 months, from December 2014 to March 7, 2016. *See id.* ¶ 55(g)-(s). Thereafter, defendants did not contact plaintiffs for more than two years, until April 3, 2018, when defendants sent a stock solicitation to Sersen via email. *Id.* ¶ 47. By that point, however, plaintiffs had filed this suit. The Eco-Gen Defendants maintain that the email of April 3, 2018, "was obviously an error as this lawsuit had been filed" on March 30, 2018. ECF 43 at 3. They add:

"Plaintiffs are trying to tack on every non-predicate act Defendant did to stretch the time period for their RICO claim." *Id.*

In my view, the length of the scheme does not satisfy the continuity requirement. *See, e.g., GE Investment*, 247 F.3d at 549 (finding that plaintiffs failed to satisfy continuity requirement where the purported conducted lasted only two years and "was designed for the single goal of allowing [the defendants] to profit from their interests [in the company]"); *Menasco*, 886 F.2d at 684 (continuity requirement not satisfied where alleged activities took place over a period of one year).

Further, the predicate acts also targeted a narrow set of victims: the Beckers, Sersen, EDRC, and ASG. Based on "information and belief," plaintiffs claim that defendants have "used the PPM to solicit investments from numerous other victims." ECF 35. However, such speculative allegations do not supply any details as to the identity or activity of the other purported victims. *See Menasco*, 886F.2d at 684 (concluding that the allegations lacked the specificity needed to show a distinct threat of continuing racketeering activity because the complaint did not provide the identity or activity of additional victims); *Swarey*, 2012 WL 4208057, at \*13 (same).

To be sure, "[t]here is no per se rule against a RICO claim involving" a small set of victims. *Al-Abood*, 217 F.3d at 238. But, as the Fourth Circuit has noted, "RICO treatment is reserved for conduct 'whose scope and persistence pose a special threat to social well-being.'" *GE Investment*, 247 F.3d 543, 551 (quoting *Menasco*, 886 F.2d at 684)). As I see it, this case "is not sufficiently outside the heartland of fraud cases to warrant RICO treatment." *Al-Abood*, 217 F.3d at 238 (finding that predicate acts of mail and wire fraud involving one victim did not transform "ordinary fraud" into a RICO violation, although the acts were "related" and "involved three discrete schemes spanning several years"); *Menasco*, 886, F.2d at 684-85 (holding that scheme to defraud

only two victims did not constitute a RICO violation but suggesting that a claim alleging 27 victims of same scheme would suffice).

Accordingly, plaintiffs' RICO claims (Counts I and II) against the Eco-Gen Defendants are subject to dismissal. *See Swarey*, 2012 WL 4208057, at *13 (finding RICO claim colorable for personal jurisdiction purposes but dismissing it for failure to state a claim).

Warren and OPEX did not move to dismiss under Rule 12(b)(6). Nevertheless, I may dismiss the RICO claims against them, *sua sponte*, for failure to state a claim. *See Eriline Co. S.A. v. Johnson,* 440 F.3d 648, 655 n. 10 (4th Cir. 2006) ("[A] district court may sua sponte dismiss a complaint for failure to state a claim . . . . Where the face of a complaint plainly fails to state a claim for relief, a district court has 'no discretion' but to dismiss it.") (citing 5A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 (2d ed. 1990)); *see also Taylor v. Acxiom Corp.,* 612 F.3d 325, 340 (5th Cir. 2010) ("While the district court did dismiss sua sponte some defendants who did not join the motion to dismiss, there is no prejudice to the plaintiffs in affirming the judgment in its entirety because the plaintiffs make the same allegations against all defendants."); *Clinton Cmty. Hosp. Corp. v. S. Md. Med. Ctr.,* 374 F. Supp. 450, 453–54 (D. Md. 1974) (dismissing claim as to all defendants where arguments made by one defendant for dismissal "apply equally to the [other] defendants . . . [and] have been exhaustively discussed by the plaintiff").

## IV.    Personal Jurisdiction as to the State Law Claims (Counts III, IV, V)

Relying on diversity jurisdiction, plaintiffs assert State law claims of fraud (Count III), civil conspiracy (Count IV), and breach of contract (Count V). ECF 35, ¶¶ 66-87. To pursue these remaining claims, plaintiffs must establish a basis for the exercise of personal jurisdiction over

defendants, unrelated to RICO. The defendants maintain that this Court lacks personal jurisdiction over the defendants as to the State claims.

### A.    OPEX's Consent to Jurisdiction

Plaintiffs assert that this Court has personal jurisdiction over all defendants for all claims, based on OPEX's consent to personal jurisdiction in this District. According to plaintiffs, Warren and the Eco-Gen Defendants "are equally bound" by OPEX's consent, based on "their close relationship" to OPEX. ECF 42 at 21.

In his Motion, Warren acknowledges that "OPEX has contractually agreed to personal jurisdiction in Maryland." ECF 38-1 at 1. But, he disputes that he is bound by OPEX's consent. He maintains that "[h]e has not agreed to personal jurisdiction and is a legal person separate and apart from OPEX." *Id.* The Eco-Gen Defendants argue that the forum selection clause in the Purchase Agreement is merely permissive and, in any event, they are not bound by it. *See Olawole v. Actionet, Inc.*, PX-16-3506, 2017 WL 1230821, at *2 (D. Md. Apr. 4, 2017) (quoting *J. v. Genuine Title, LLC*, RDB-14-0081, 2015 WL 8315704, at *13 (D. Md. Dec. 9, 2015), *certified question answered sub nom. Fangman v. Genuine Title, LLC*, 447 Md. 691 (2016)).

OPEX and EDRC were parties to the Purchase Agreement (ECF 41-1). Warren signed the Purchase Agreement on behalf of OPEX. ECF 41-1 at 6. It contains a choice of law and forum selection provision, as follows, *id.* at 5:

22. This Purchase Agreement will be governed by and construed in accordance with the laws of the State of Maryland, including the Maryland Uniform Commercial Code and the Seller and Purchaser herby attorn to the jurisdiction of the Courts in the State of Maryland.

The Release (ECF 41-2) was executed by Warren on behalf of OPEX, and by Warren in his personal capacity. ECF 41-2 at 8. It states, in relevant part, *id.* at 4:

42

11. **Governing Law and Jurisdiction.** The laws of the State of Maryland shall apply to and control and interpretation, construction, performance or enforcement of this Agreement. The Parties agree that the exclusive jurisdiction for any legal proceeding arising out of or relating to this Agreement shall be in the U.S. District Court for the District of Maryland, and all Parties hereby waive any challenge to personal jurisdiction or venue in that court.

A forum selection clause can constitute "'consent to personal jurisdiction, or at least a waiver of any objection, when invoked by the plaintiff.'" *Green v. Presidential Bank, FSB*, No. 2092, Sept. Term 2016, 2018 WL 904445, at *4 (Md. Ct. Spec. App. Feb. 14, 2018) (quoting *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 764 (D. Md. 2009)); *see also Consulting Eng'rs*, 561 F.3d at 282 n.11 ("We note in passing that a valid forum selection clause . . . may act as a waiver to objections to personal jurisdiction."). In *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10-12 (1972), the Supreme Court determined that forum-selection clauses are "prima facie valid" when made through "arm's-length negotiation by experienced and sophisticated businessmen," and "should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances."

In *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), the Court reiterated this principle. It observed that parties to an agreement may, in essence, contract around principles of personal jurisdiction by consenting to resolve their disputes in specified tribunals. *Id.* at 471 n.14; *see also Truserv Corp. v. Flegles, Inc.*, 419 F.3d 584, 589 (7th Cir. 2005) (upholding exercise of personal jurisdiction over guarantor, where guaranty contained consent to jurisdiction in forum state, noting that "'personal jurisdiction is waivable and . . . parties can, through forum selection clauses and the like, easily contract around any rule we promulgate,'" and that "'[o]bviously, a valid forum-selection clause, even standing alone, can confer personal jurisdiction'") (citations omitted).

As one of two members of OPEX, and the sole managing member, Warren is bound by OPEX's consent to jurisdiction, contained in the Purchase Agreement. *See Marano Enters. of*

*Kan. V. Z-Teca Rests, L.P.*, 254 F.3d 753, 758 (8th Cir. 2001). Notably, he stood to benefit directly from the business arrangements of OPEX, including the payment of the deposit for the JouleBox. Therefore, this Court may exercise personal jurisdiction over Warren, and his Motion (ECF 38) is denied.

As to the Eco-Gen Defendants, I reach a different result.

In *Olawole*, 2017 WL 1230821, Judge Xinis used a "three-step analysis to assess the enforceability and applicability of a forum selection clause as to the plaintiff," a non-party to the agreement. *Id.* at \*2. First, the court must determine whether the clause is mandatory. If so, it is "'presumptively enforceable.'" *Id.* (citation omitted). Second, the court must determine whether the specific claims fall within the scope of the clause. *Id.* Third, the court must determine if "'the party opposing enforcement has rebutted the presumption of enforceability by providing that enforcement would be unreasonable.'" *Id.* (citation omitted).

Judge Xinis applied federal law in the court's analysis of a forum-selection clause, as the underlying action was based on federal question jurisdiction. However, in the context of diversity jurisdiction, relevant state law applies. *See Varsity Gold, Inc. v. Lunenfeld*, CCB-08-550, 2008 WL 5243517, at \*2 (D. Md. Dec. 12, 2008). But, Maryland has adopted the federal standard with regard to the evaluation of forum selection clauses. *See Koch v. Am. Online, Inc.*, 139 F. Supp. 2d 690, 693 (D. Md. 2000). And, Maryland courts follow the rule of *lex loci contractus*, applying the substantive law of the state, where the contract was formed, unless there is a choice-of-law provision in the contract. *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *Griffith Energy Servs., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 224 Md. App. 252, 274, 120 A.3d. 808, 821 (2015); *U.S. Life Ins. Co. v. Wilson*, 198 Md. App. 452, 462-63, 18 A.3d 110, 116 (2011).

The Eco-Gen Defendants assert that the Purchase Agreement's forum-selection clause is not mandatory. In their view, the forum selection clause of the Purchase Agreement is "vague and fatally ambiguous." ECF 43 at 6. In this regard, they observe that the clause "does not state that Maryland is the exclusive jurisdiction for any disputes" and therefore it "is permissive at best." *Id.*

Moreover, the Eco-Gen Defendants point to the word "attorn" in the clause, claiming that the word supports their view that the clause is permissive, not mandatory. *Id.* The word "attorn" is defined as "[t]o turn over; to transfer to another money or goods; to assign to some particular use or service." BLACK'S LAW DICTIONARY (6th ed. 1990).

According to defendants, courts have interpreted "attorn" as mandatory only when "amplified by a mandatory term such as 'irrevocably' or 'exclusively.'" ECF 43 at 7; *see Pro Step Mktg., Inc. v. Real Estate Webmasters, Inc.*, 5:16-cv-00072-RLV-DSC, 2017 WL 3595489 (W.D.N.C. Aug. 21, 2017) (interpreting "irrevocably attorn" to convey exclusive jurisdiction in the context of the entirety of the agreement but acknowledging that several courts have found the same term to be permissive); *see also, e.g.*, *Southridge Ethanol, Inc. v. South Louisiana Ethanol LLC*, 3:06-cv-2362-G, 2007 WL 2375758, at *8 (N.D. Tex. Aug. 16, 2007) (finding that the use of "attorn" in a forum selection clause was "insufficient to clearly demonstrate the parties' intent to make jurisdiction exclusive"); *Magellan Real Estate Investment Tr. v. Losch*, 109 F. Supp. 2d 1144, 1149 (D. Ariz. 2000) (finding permissive a forum-selection clause that contained "irrevocably attorn").

The clause at issue does not contain any language that modifies the word "attorn." Moreover, the text does not mandate that Maryland is unequivocally the exclusive place for suit. *See FindWhere Holdings, Inc., v. Sys. Envtl. Optimizations, LLC*, 626 F.3d 752, 754 (4th Cir. 2010)

(concluding that the phrase "any dispute or legal action . . . *shall lie exclusively in*" rendered the forum selection clause mandatory and excluded any other proper venues) (emphasis added).[7]

I need not resolve the issue, however. This is because, even assuming, *arguendo*, that the forum selection clause is mandatory and enforceable, it does not bind the Eco-Gen Defendants.

The recent case of *Peterson v. Evapco, Inc.*, 238 Md. App. 1, 188 A.3d 210 (2018), provides guidance. There, the Maryland Court of Special Appeals adopted the "closely related" doctrine with respect to the exercise of personal jurisdiction over a non-resident party who did not sign the contract in issue. The court determined that "a non-signatory to a contract may nonetheless be bound by that contract's forum-selection clause" if the non-signatory is so "'closely related to the dispute such that it becomes 'foreseeable' that it will be bound.'" *Peterson*, 238 Md. App. at 33, 188 A.3d at 228 (quoting *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993)). But, I cannot conclude from the allegations that the Eco-Gen Defendants are so closely-related to OPEX as to create personal jurisdiction over them on the basis of OPEX's consent to suit.

The individual Eco-Gen Defendants are not owners of OPEX. Moreover, as the defendants point out, "there are no allegations that OPEX was an employee, an officer or a shareholder of Eco-Gen," or vice versa. ECF 43 at 8. There is no claim that OPEX designed or developed the JouleBox; participated in Eco-Gen's operations or contract negotiations; or that OPEX was otherwise obligated to Eco-Gen or subject to Eco-Gen's control." *Id.*

As such, this Court may not assert personal jurisdiction over the Eco-Gen Defendants based on OPEX's consent to jurisdiction.

---

[7] In contrast to the Purchase Agreement, the forum selection clause contained in the Release is more precise. *See* ECF 40-1; ECF 43. As noted, it states, in relevant part, ECF 41-2 at 4 (emphasis added): "The Parties agree that the *exclusive* jurisdiction for any legal proceeding arising out of or relating to this Agreement shall be in the U.S. District Court for the District of Maryland . . . ." (emphasis added).

## B. Maryland Long-Arm Statute

Plaintiffs contend that the Eco-Gen Defendants are subject to specific long-arm jurisdiction under Maryland's long-arm statute and the Fourteenth Amendment. ECF 42 at 25. Defendants disagree, arguing that they "did not purposefully avail themselves of the privilege of conducting business in Maryland." ECF 40-1 at 14.

Fed. R. Civ. P. 4(k)(1)(A) authorizes a federal district court to exercise personal jurisdiction over a defendant in accordance with the law of the state in which the district court is located. *Carefirst of Md.*, 334 F.3d at 396. Therefore, in Maryland, "to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Id.*; *accord Carbone v. Deutsche Bank Nat'l Tr. Co.*, RDB-15-1963, 2016 WL 4158354, at *5 (D. Md. Aug. 5, 2016).

Maryland's long-arm statute is codified at Md. Code (2013 Repl. Vol., 2016 Supp.), § 6-103(b) of the Courts & Judicial Proceedings Article ("C.J."). It authorizes "personal jurisdiction over a person, who directly or by an agent," *id.*:

(1) Transacts any business or performs any character of work or service in the State;
(2) Contracts to supply goods, food, services, or manufactured products in the State;
(3) Causes tortious injury in the State by an act or omission in the State;
(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;
(5) Has an interest in, uses, or possesses real property in the State; or
(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

47

When interpreting the reach of Maryland's long-arm statute, a federal district court is bound by the interpretations of the Maryland courts. *See Carbone*, 2016 WL 4158354, at *5; *Snyder v. Hampton Indus., Inc.*, 521 F. Supp. 130, 135-36 (D. Md. 1981), *aff'd*, 758 F.2d 649 (4th Cir. 1985); *see also Mylan Labs.*, 2 F.3d at 61. Maryland courts have "consistently held that the reach of the long arm statute is coextensive with the limits of personal jurisdiction delineated under the due process clause of the Federal Constitution" and that the "statutory inquiry merges with [the] constitutional examination." *Beyond Sys., Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 22, 878 A.2d 567, 580 (2005) (citing *Mohamed v. Michael*, 279 Md. 653, 657, 370 A.2d 551, 553 (1977)); *see also Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996) (stating that "the two inquiries essentially become one"); *accord ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002).

To be sure, "the reach of the [long-arm] statute is as far as due process permits . . . ." *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 140 n.5, 892 A.2d 479, 492 n.5 (2006). However, the Maryland Court of Appeals has clarified that the statutory analysis remains a requirement of the personal jurisdiction analysis. In *Mackey*, the Maryland Court of Appeals said, 391 Md. at 141 n.6, 892 A.2d at 493 n.6 (citations omitted):

> We stated recently in *Beyond v. Realtime* . . . that "the purview of the long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution." We did not, of course, mean by this that it is now permissible to simply dispense with analysis under the long-arm statute . . . . Rather, . . . we interpret the long-arm statute to the limits permitted by the Due Process Clause when we can do so consistently with the canons of statutory construction.

Since *Mackey*, the Maryland Court of Appeals has repeatedly affirmed that "determining whether a Maryland court may exercise personal jurisdiction over a foreign defendant requires a two-step analysis." *Bond v. Messerman*, 391 Md. 706, 721, 895 A.2d 990, 999 (2006); *see*

*also CSR, Ltd. v. Taylor,* 411 Md. 457, 472, 983 A.2d 492, 501 (2009) (stating that personal jurisdiction analysis "entails dual considerations"). First, the court considers "whether the requirements of Maryland's long-arm statute[] are satisfied." *CSR,* 411 Md. at 472, 983 A.2d at 501 (citing *Bond,* 391 Md. at 721, 895 A.2d at 999; *Mackey,* 391 Md. at 129, 892 A.2d at 486; and *Beyond,* 388 Md. at 14, 878 A.2d at 576). Second, it considers "whether the exercise of personal jurisdiction comports with the requirements imposed by the Due Process Clause of the Fourteenth Amendment.[]" *CSR,* 411 Md. at 473, 983 A.2d at 501 (citing *Bond,* 391 Md. at 721, 895 A.2d at 999; and *Beyond,* 388 Md. at 15, 878 A.2d at 575). Nevertheless, the Maryland Court of Appeals has, in some situations, declined to consider the first step where the analysis of the second step demonstrates conclusively that personal jurisdiction over the defendant would violate due process. *See, e.g., Bond,* 391 Md. at 722, 895 A.2d at 1000.

Due process jurisprudence recognizes "two types of personal jurisdiction: general and specific." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India,* 551 F.3d 285, 292 n.15 (4th Cir. 2009). The Fourth Circuit has explained:

> General personal jurisdiction, on the one hand, requires "continuous and systematic" contacts with the forum state, such that a defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred. Specific personal jurisdiction, on the other hand, requires only that the relevant conduct have such a connection with the forum state that it is fair for the defendant to defend itself in that state.

*Id.* (citing, *inter alia, Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414-15, (1984)) (internal citations omitted).

The United States Supreme Court has long held that personal jurisdiction over a nonresident defendant is constitutionally permissible so long as the defendant has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.*, 326 U.S. at 316 (quoting *Milliken v.*

49

*Meyer*, 311 U.S. 457, 463 (1940)). Courts have separated this test into individual "prongs," first ascertaining whether the threshold of "minimum contacts" is met, and then considering whether the exercise of jurisdiction on the basis of those contacts is "constitutionally reasonable." *ALS Scan*, 293 F.3d at 712; *see Consulting Eng'rs*, 561 F.3d at 276.

A court may exercise general jurisdiction over foreign corporations to hear "any and all claims" against the corporations "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe*, 326 U.S. at 317). In contrast, specific jurisdiction "depends on an 'affiliatio[n] between the forum and the underlying controversy . . . .'" *Id.* (citation omitted) (alteration in *Goodyear*).

The "minimum contacts" test is met where the defendant has "purposefully avail[ed] himself of the privilege of conducting business under the laws of the forum state." *Consulting Eng'rs*, 561 F.3d at 278. A determination that the defendant has established minimum contacts with the forum state amounts to a conclusion that "'it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

Generally, the court must consider the prong of constitutional reasonableness "[i]f, and only if" the minimum contacts test is met. *Consulting Eng'rs*, 561 F.3d at 278. The constitutional reasonableness inquiry permits a defendant "who purposefully has directed his activities at forum residents" to defeat jurisdiction, if he can "present a compelling case that the presence of some other considerations would render jurisdiction unconstitutional." *Burger King*, 471 U.S. at 477. However, in some cases, the constitutional reasonableness analysis can "serve to establish the

50

reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Id.*

When the defendant is a nonresident corporate agent, the court must examine the defendant's contacts with the forum state in his individual capacity. *Birrane v. Master Collectors, Inc.*, 738 F. Supp. 167, 169 (D. Md. 1990). The defendant's contacts as a corporate agent on corporate business are not sufficient to establish personal jurisdiction. *Rhee Bros. v. Han Ah Reum Corp.*, 178 F. Supp. 2d 525, 532 (D. Md. 2001) (citations omitted). A judge of this court has explained, *Birrane v. Master Collectors, Inc.*, 738 F. Supp. 167, 169 (D. Md. 1990) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)):

> An individual who has chosen simply to transact business in a state through a valid and viable corporation has not necessarily "purposefully availed" himself of "the privilege of conducting activities within . . . [that] State" in his individual capacity . . . Nor can it be said that he would "reasonably anticipate being haled into court" in the state in his individual capacity by virtue of the corporation's activities there.

As indicated, general jurisdiction allows a plaintiff to bring "any and all claims" against a party in that jurisdiction. *Goodyear*, 564 U.S. at 919. "[T]he threshold level of minimum contacts sufficient to confer general jurisdiction is significantly higher than for specific jurisdiction." *ALS Scan,* 293 F.3d at 715 (internal quotation marks omitted); *accord Saudi v. Northrop Grumman Corp.,* 427 F.3d 271, 276 (4th Cir. 2005). The Fourth Circuit has long held that "broad constructions of general jurisdiction" are "generally disfavored." *Nichols v. G.D. Searle & Co.,* 991 F.2d 1195, 1200 (4th Cir. 1993).

To determine whether there is specific jurisdiction over a defendant, courts consider: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally

51

reasonable." *Consulting Eng'rs,* 561 F.3d at 278 (citing *ALS Scan,* 293 F.3d at 715); *accord Unspam Techs., Inc. v. Chernuk,* 716 F.3d 322, 328 (4th Cir. 2013); *ESAB Grp., Inc. v. Zurich Ins. PLC,* 685 F.3d 376, 392 (4th Cir. 2012); *Carefirst of Md.,* 334 F.3d at 397.

"The first prong articulates the minimum contacts requirement of constitutional due process that the defendant purposefully avail himself of the privilege of conducting business under the laws of the forum state." *Consulting Eng'rs,* 561 F.3d at 278. In determining whether a defendant has engaged in such purposeful availment, courts have considered various factors, including the following, *id.* (internal citations omitted):

- whether the defendant maintains offices or agents in the forum state;
- whether the defendant owns property in the forum state;
- whether the defendant reached into the forum state to solicit or initiate business;
- whether the defendant deliberately engaged in significant or long-term business activities in the forum state;
- whether the parties contractually agreed that the law of the forum state would govern disputes;
- whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship;
- the nature, quality and extent of the parties' communications about the business being transacted; and
- whether the performance of contractual duties was to occur within the forum.

Plaintiffs point to several contacts between defendants and the State of Maryland, asserting that the Eco-Gen Defendants "took affirmative steps to form a targeted and ongoing relationship with the Plaintiffs in Maryland . . . ." ECF 42 at 26. Specifically, they allege that Eco-Gen delivered two PPMs to plaintiffs, "whom it knew to be Maryland residents." *Id.* (citing ECF 35, ¶¶ 26, 47). Also, plaintiffs allege that "Mr. Noe induced Mr. Sersen to travel [from Maryland] to California to view the JouleBox." ECF 42 at 27 (citing ECF 35, ¶ 39). And, "[d]efendants later delivered a stock certificate to Mr. Sersen in Maryland as an incentive to ASG as an early adopter of the JouleBox." ECF 42 at 27 (citing ECF 35, ¶ 41). Plaintiffs further allege: "Mr. Becker

52

agreed to serve as a sales representative for OPEX and the JouleBox (and, thereby, Eco-Gen) for the Washington, D.C. and Baltimore areas." ECF 42 at 27 (citing ECF 35, ¶ 36). In addition, plaintiffs maintain: "The Lease-Purchase Agreement contemplated the delivery of one of Eco-Gen's JouleBoxes to ASG's location in Maryland[.]" ECF 42 at 27 (citing ECF 35, ¶ 42).

Defendants never appeared in Maryland with respect to the alleged scheme. For example, there is no claim that defendants entered Maryland to negotiate with plaintiffs or to sign a contract. Moreover, the JouleBox was never delivered. Defendants did not establish an office in Maryland. At most, defendants engaged in conduct involving persons located in Maryland, and they did so largely by availing themselves of mail and electronic communications.

The Supreme Court expounded on the minimum contacts requirement in *Burger King*, *supra*, 471 U.S. 462. There, the Court explained that minimum contacts are not "'random,' 'fortuitous,' or 'attenuated' contacts," but rather are contacts that involve "significant activities within a State" or "'continuing obligations' between [the defendant] and residents of the forum." *Id.* at 475-76 (citations omitted). The benchmark is "'foreseeability . . . that the defendant's conduct and connections with the forum state are such that he should reasonably anticipate being hauled into court there.'" *Id.* at 474 (quoting *World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 286, 295 (1980)).

In the context of a contractual relationship, the *Burger King* Court stated unequivocally that entering into a contract with a citizen of the forum state "*alone*" cannot "automatically establish minimum contacts" over a nonresident defendant. *Burger King*, 471 U.S. at 478 (emphasis in original). But, the Court was equally clear that "even a single act can support jurisdiction," so long as that act "creates a 'substantial connection' with the forum." *Id.* at 475 n.18 (citation omitted). The Court also stated: "Although territorial presence frequently will

53

enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there," jurisdiction cannot be "avoided merely because the defendant did not *physically* enter the forum State." *Id.* at 476 (emphasis in original). Of import here, the *Burger King* Court observed that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.*

Notably, the Supreme Court explained, *id.* at 479 (internal citations omitted):

[A] "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum.

In my view, the contacts attributed to the defendants are insufficient to give rise to specific personal jurisdiction. *See J. McIntyre Mach. Ltd. v. Nicastro*, 564 U.S. 873, 885-86 (2011) (Breyer, J., concurring) (finding there was no personal jurisdiction over a British company that directed marketing and sales efforts at the United States as a whole through a distributor, but whose only contact with the forum state was the sale of one of its machines to a resident of that state).

As indicated, the defendants had no physical presence in Maryland. From outside of Maryland, they allegedly induced parties in Maryland to travel to California; they mailed a stock certificate to Maryland; they entered into agreements with persons who were residents of Maryland; money was transferred from Maryland; and they communicated with plaintiffs, who were located in the State of Maryland. The defendants also allegedly induced plaintiffs to believe that a product would be sent to Maryland. If this conduct gives rise to specific personal jurisdiction, it is difficult to conceive of any business dealings that would not justify the exercise of personal jurisdiction.

54

The Fourth Circuit has made clear that a "prospective defendant need not initiate the relevant 'minimum contacts' to be regarded as purposefully availing himself of the privileges of conducting activity in the forum state." *Christian Sci. Bd. of Directors v. Nolan*, 259 F.3d 209, 216-17 (4th Cir. 2001) (upholding exercise of personal jurisdiction where out-of-state defendant was invited to do business "within the context of his friendship and ongoing correspondence" with forum state resident, and "deliberately entered into a collaborative enterprise" with resident of the forum state). *See also Gen'l Elec. Co. v. Deutz AG*, 270 F.3d 144, 151 (3d Cir. 2001) ("It is not significant that one or the other party initiated the relationship. In the commercial milieu, the intention to establish a common venture extending over a substantial period of time is a more important consideration.") (internal citation omitted). Several cases, including *Burger King*, 471 U.S. at 480, have cited contractual requirements to send monthly payments to the forum state among the factors favoring jurisdiction. But, those cases have included other factors that also supported jurisdiction.

In *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 452 (4th Cir. 2001), the Fourth Circuit ruled that personal jurisdiction could not be exercised over a nonresident corporation that had entered into a contract with a forum state corporation. The contract was for the operation of a medical facility outside the forum, but called for monthly payments to be sent to the forum state. In that context, in which several other factors weighed against jurisdiction, the Court was of the view that the payment provisions "amounted only to 'attenuated contact' with" the forum. *Id.* (citation omitted). *See also Southfork Apartments, supra*, 93 F. Supp. 2d at 628 & n.5 (rejecting personal jurisdiction despite requirement to send monthly payments to forum state).

Absent here was a "regular course of sales" into Maryland from which one could reasonably infer that there was a purposeful direction of the product into Maryland. *See Hart v. Bed Bath & Beyond, Inc.*, 48 F. Supp. 3d 837, 842-43 (D. Md. 2014) (finding minimum contacts where the defendant packaged and labeled its product specifically for a "clearly defined network of distributors" that defendant knew would sell the product in Maryland, and where a significant volume of the product, 1,992 bottles, had been sold in Maryland).

In addition, The *Consulting Engineers* factors weigh in favor of defendants. The Eco-Gen Defendants convincingly argue, ECF 40-1 at 15 (internal citations omitted):

> There is no allegation that Defendants have an office in Maryland or maintain a registered agent in Maryland. Plaintiffs do not allege that Defendants own property in Maryland or have employees there. The only in-person meeting between the parties took place in California, not Maryland. The only stock at issue is Eco-Gen stock, and Eco-Gen is a Nevada corporation with its principal place in California. The JouleBox was manufactured in California.

As such, plaintiffs have failed to demonstrate the requisite minimum contacts in Maryland.

## C. Conspiracy Theory

Under Maryland law, a plaintiff may assert personal jurisdiction pursuant to a conspiracy theory, when:

> "(1) two or more individuals conspire to do something

> (2) that they could reasonably expect to lead to consequences in a particular forum, if

> (3) one co-conspirator commits overt acts in furtherance of the conspiracy, and

> (4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state, then those over acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum."

*Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 129, 892 A.2d 479, 486 (2006) (citing *Cawley v. Bloch*, 544 F. Supp. 133, 135 (D. Md. 1982)).

However, the conspiracy theory of jurisdiction requires the same sufficient minimum contacts required by due process. Plaintiffs have failed to make such a showing. Therefore, this basis for personal jurisdiction also fails.

## V.    Conclusion

Plaintiffs have not alleged a prima facie showing of personal jurisdiction over the Eco-Gen Defendants. Accordingly, I shall GRANT the Eco-Gen Motion (ECF 40); all claims against the Eco-Gen Defendants are subject to dismissal, without prejudice. For the reasons stated above, I shall DENY the Warren Motion (ECF 38). However, because plaintiffs fail to state RICO claims (Counts I and II), plaintiffs may proceed against Warren and OPEX only as to the State law claims (Counts III, IV, and V). The RICO claims shall be dismissed, without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date: March 27, 2019                         /s/
                                        Ellen L. Hollander
                                        United States District Judge

57